**MICHELLE HOLMAN KERIN**, OSB No. 965278
michelle@angelicalfo.com
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LI TIAN, et al.<br><br>Defendants. | Case No. Case No. 3:25-cr-00078-IM<br><br>**DEFENDANT LI TIAN'S MEMORANDUM IN SUPPORT OF RELEASE FROM CUSTODY PENDING TRIAL**<br><br>**Hearing: April 11, 2025 at 1:30 pm** |

## INTRODUCTION

The defendant, Lieutenant Li Tian is a husband, a father, a caregiver, a United States citizen and decorated officer of the United States Army. He is charged with non-violent crimes that do not carry a presumption of detention. The government cannot demonstrate he is either a flight risk or a danger to the community and there are no facts that support his continued detention. The Court should follow the recommendation of Pretrial Services in both this district and the Western District of Washington and release him.

/ / /

/ / /

/ / /

## **DISCUSSION**

### A. Factual Background

Lieutenant Tian has served honorably in the United States Army for more than ten years, receiving multiple awards and commendations since he enlisted. He moved to the United States in 2007 from China and has only returned to China one time, in 2008. Lieutenant Tian became a United States citizen in approximately 2017.

He is married and has two children, one of whom has a serious medical condition that could become acute and life threatening. He and his wife own a home in Washington and have friends and family, including an Aunt and Uncle, in the United States. While his parents live in China for part of the year, they have permanent residence status and own property in the United States. In short, Lieutenant Tian has strong ties to the community, has lived a law-abiding life within the United States, and there is no evidence or indication that he would flee or not appear before this Court.

### B. Legal Standard

Under the Bail Reform Act, pretrial detention is permitted only if the Court finds there is no condition of release, or combination of conditions, which would reasonably assure the appearance of the defendant and the safety of the community. See 18 U.S.C. § 3142(e)(1). "On a motion for pretrial detention, the government bears the burden." *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015). Any doubts regarding the propriety of pretrial release are to be resolved in favor of the defendant. *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990); *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1998 (9th Cir. 2019)

The Court must engage in a two-step process in determining whether a defendant should be detained pending trial under the Bail Reform Act.

First, the Court must consider whether the government is authorized to seek detention at all. *U.S. v. Spirea*, 2024 WL 4903759 (D.Or. November 27, 2024). Detention hearings are authorized only if "the defendant (i) is charged with one of five categories of serious crimes—crimes that, if the defendant were to recidivate while on pretrial release, pose the greatest risk to community safety; or (ii) presents a serious risk of flight, or a serious risk of obstruction or intimidation—acts that present the greatest risk to the integrity of the judicial process." *United States v. Figueroa-Alvarez*, 681 F. Supp. 3d 1131, 1135 (D. Idaho 2023).

The Bail Reform Act requires the Government to present concrete information specific to the defendant to demonstrate that a case is eligible for a detention hearing under § 3142(f).4 *See Figueroa-Alvarez*, 681 F. Supp. 3d at 1138 ("[T]he Government must present 'concrete information' not 'mere conclusory allegations.'") (citations omitted). If they cannot, "a defendant must be released on personal recognizance ... or conditions." *Id.* at 1135-36 (citing 18 U.S.C. § 3142(a)).

This is not a case involving any of the enumerated offenses listed in section 3142(f)(1). The government, therefore, has the burden to demonstrate by a preponderance of the evidence that defendant presents a serious risk of flight. *Id*, at 1138 (citations omitted). "A 'serious risk of flight' is a great risk—beyond average—that the defendant will intentionally and actively move within or outside the jurisdiction to avoid court proceedings or supervision." *Id.,* 681 F. Supp. 3d at 1138.

Once the Court has determined that the government is entitled to a detention hearing under § 3142(f)—the Court may engage in the second step and conduct a detention hearing to see whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any person and the community under § 3142(e). *United*

*States v. Cobix-Espinoza*, 655 F. Supp. 3d 584, 589 (ED KY 2023). The Court considers the following factors in its analysis: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g).

      C.      **The Factors Under § 3142(g) Strongly Favor Defendant's Release**

            1.      **The Nature and Circumstances of the Offenses Charged Warrant Release.**

The nature and circumstances of the offenses charged against Lieutenant Tian favor release. In its zeal to detain Lieutenant Tian, the government has argued that both the type of conduct alleged in the Indictment and the significant potential sentence Officer Tian faces warrant detention. Motion, pp. 5-6. The government has overstated each.

First, with respect to the severity of the offense, Lieutenant Tian's guidelines are on the low end of cases in this District.

In its detention memo, the government told the Court, Lieutenant Tian's "applicable guidelines result is a base offense level of at least 24, **prior to any departures upward or downward**, resulting in potential prison sentence of 51 to 63." Motion, pp 5-6. The government further cautioned the Court that "the high-end of the applicable Guideline is 188 months but the statutory maximum is 15 years or 180 months." Motion, p. 6, fn. 2. That was incorrect. It's unclear what guideline the government was referring to, but the government now concedes that if Lieutenant Tian is convicted, the applicable guideline in this case is U.S.S.G. §2C1.1 and a base offense level of 14.

Under this analysis, the highest Lieutenant Tian's resulting guideline offense level, after downward departures for being a zero-point offender and acceptance of responsibility, would be

PAGE 4 – DEF. TIAN'S MEMO IN SUPPORT OF RELEASE

a 15[1] (and a resulting guideline range of 18-24 months) and as low as an offense level 9 (landing him in Zone B with a resulting guideline range of 4-10 months). The severity of his punishment does not support an inference he is likely to flee and thus, continued detention is warranted. Indeed, Lieutenant Tian has already been in BOP custody for a month.

Second, the defense investigation is ongoing, but the documents outlined in the Indictment that Lieutenant Tian allegedly stole from the Army and "sold" to his co-defendant were not classified, were (mostly) dated by 5 or more years at time of their distribution,[2] and/or are completely or largely available on the internet or other public sources. They are not documents that contain information, as stated in the government's detention memo, that "puts our community, specifically our national community, and the national security of the United States in danger" to such an extent that "there are no conditions or combination of conditions" that could mitigate this risk. Motion, p.6.

The OSINT reports are a good example. The Indictment alleges Lieutenant Tian sent various OSINT reports to his codefendant on October 18, 25 and November 3, 2022. Indictment, ¶32 (Overt Acts 6-8). The Indictment defines the acronym OSINT and indicates the information contained in the report is not classified (Indictment fn. 4), but the Indictment and the detention memo fail to provide a fulsome explanation of what these reports actually contain.

As the defense understands it, OSINT reports are sent via unclassified email to military personnel daily or near daily. The reports quote **publicly available news articles** from around

---

[1] The defense does not concede this is the resulting guideline range. Instead for purposes of this hearing, this calculation includes several, but not all, disputed enhancements the government contends are applicable.

[22] This does not include the OSINT reports described in the Indictment at paragraph 32 (Overt Acts 6-8), but as will be demonstrated below, it appears that every word in the OSINT reports, though not the actual reports, were publicly available on the internet.

PAGE 5 – DEF. TIAN'S MEMO IN SUPPORT OF RELEASE

the world, providing both the title and source of the article and a hyperlink to the information.[3] The information contained in the OSINT reports appear to be direct or almost direct quotes from the publicly available news articles. There is little if any independent analysis of the publicly available news articles.[4]

Here is an example from an October 2022 OSINT report that Lieutenant Tian allegedly sent his codefendant. A section of the OSINT report for this date states:

> (U) Korean Peninsula: PRK, Fires at the Same Time 150 Fighter Aircraft on 8 October    (Home)
> (U) Website | Yonhap Online | "North Korea, fires at the same time 150 fighter aircraft on 8 October." | 2022-10-10 | hxxps://www.yna.co.kr/view/AKR20221010021551504 || Accessed 2022-10-10 | U.S. Person: NO
> (U) It was confirmed late on the 10th that North Korea held an air force demonstration by mobilizing 150 fighter jets on the 8th. On the 6th, 8 fighters and width
>
> (U) It is said to be an extremely unusual provocation as it is more than 10 times the size of the demonstration that partially moved the special surveillance ship to the south in four separate phases. North Korea imminent.
>
> (U) It is interpreted that the ROK and the U.S. were demonstrating their power to strengthen the combined readiness posture to prepare for the 7th nuclear test.

The article mentioned in the OSINT report is publicly available and entitled:[5]

> Latest News
> **North Korea, simultaneous sortie of 150 fighters on the 8th... Military responds with F-35As (comprehensive)**
> Submission 2022-10-10 10:55    Chinese

---

[3] Some of the hyperlinks in the OSINT reports are purposefully broken because the news articles are from foreign news sources and linking to those articles on government computers may pose cybersecurity dangers and/or violations of cybersecurity policies.

[4] The defense team has not had an opportunity to review all of the information in the various OSINT reports Lieutenant Tian is accused of providing to his codefendant because they were produced Tuesday, April 8, 2025. Based on its initial review of many of the reports, the information contained in the OSINT reports is directly from public articles and no independent military analysis appears to be included.

[5] https://www.yna.co.kr/view/AKR20221010021551504 (last visited April 10, 2025).

Moreover, each of the above bullet points in the OSINT report related to this article is verbatim or close to verbatim from the article:[6]

> (Seoul = Yonhap News) Reporter Ji-heon Kim = It has been belatedly confirmed that North Korea mobilized as many as 150 fighter jets to conduct an aerial demonstration of force on the 8th.

And this:

> This is more than 10 times the scale of the protest that North Korea staged on the 6th, when it sent 8 fighter jets and 4 bombers south along a special surveillance ship, and is being evaluated as extremely unusual and somewhat irrational.

Another example from the same article; the OSINT report states:

> (U) According to the military on the 10th, North Korea conducted a 'large-scale air attack comprehensive exercise' on the 8th by mobilizing about 150 fighter jets. In response, the military authorities responded with an overwhelmingly superior force by injecting state-of-the-art assets such as the F35A stealth fighter at the time. F-35A drills North Korean armed protests.
>
> (U) It is the first time in nine months since the deployment of 40 units was completed in January.

The publicly available article states nearly verbatim the same:

> According to the military on the 10th, North Korea conducted a 'large-scale air attack comprehensive training' on the 8th, mobilizing about 150 fighter jets. In particular, the military also urgently dispatched F-35A stealth fighter jets during this process.

> This is the first time in nine months since the deployment of 40 aircraft was completed in January that the F-35A has been publicly deployed in response to North Korea's military demonstration training.

---

[6] The slight differences between the OSINT reports and the excerpts here may be due to inconsistencies in translations. The translation of the article here, from Korean to English, is via Google Translate. It is unknown how the articles in the OSINT reports were translated.

PAGE 7 – DEF. TIAN'S MEMO IN SUPPORT OF RELEASE

The Indictment also specifies several documents allegedly sent by Lieutenant Tian to his codefendant and attempts to sensationalize their contents. Overt Act 10, for example, highlights a document titled "Copy of 1 SBCT EMPLOYMENT 1.pptx," which it claims "discusses the formations, movements, and employment" of the Stryker Brigade Combat Team (SBCT). But as the slide deck itself indicates, *nearly the entirety of this document is copied verbatim* from a training manual that was released to the public *over 15 years ago* as well as a publicly available article. *See* https://www.globalsecurity.org/military/library/policy/army/attp/attp3-21-9.pdf at 59; Hymel, K. M. (2009) Strykers in Afghanistan. 1st BN, 17th Inf. Reg. in Kandahar Province, Combat Studies Institute Press. US Army CAC, Fort Leavenworth, Kansas, *available at* https://www.armyupress.army.mil/Portals/7/combat-studies-institute/csi-books/StrykersInAfghanistan.pdf.

Another of the documents alleged in Overt Act 10 is a six-page slide deck which, according to the government, "specifies the positions of military personnel in the Stryker U.S. army combat vehicle." But many similar seating charts for Stryker platoons can be found in the public domain. *See, e.g.,* https://www.reddit.com/r/WarCollege/comments/b10pkp/visualization_of_us_army_stryker_platoon/; https://www.battleorder.org/usa-vehicle-graphics.

Another of the documents the government maintains are so "sensitive" as to justify detention (a 140-page "Solder's Manual and Trainer's Guide" for the Stryker with the file name "stp_91s13.pdf") appears to be available *in its entirety* online. *See* https://www.coursehero.com/file/85491723/stp9-91s13pdf/

Moreover, while the government appears to concede that at least one of the documents mentioned in Overt Act 12 of the Indictment was "approved for public release" (even as it hints

PAGE 8 – DEF. TIAN'S MEMO IN SUPPORT OF RELEASE

darkly that the document contains a "pre-combat checklist for a military vehicle) it fails to mention that this document was approved for public release *over 30 years ago* and available online: https://www.nsndepot.com/Library/TM/TM-9-2350-311-PCL.

The point is this: Lieutenant Tian does not dispute that the allegations in the Indictment are serious. They are. However, the government has overstated and sensationalized to the Court the nature of the information he is alleged to have stolen apparently for the purpose of detaining him pending trial. A closer look at the evidence demonstrates the nature and circumstances of the offense charged against him warrant his release pending trial. The Ninth Circuit is clear: "Only in rare cases should release be denied, and doubts regarding the propriety of release are to be resolved in favor of the defendant." *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015) (citations omitted). The nature and circumstance of the offense warrant Lieutenant Tian's release.

    2.    **The History and Characteristics of the Defendant**

As demonstrated by the pretrial report, the defendant has strong and overwhelming ties to the community, he has no criminal history, has gainful employment, and has a history of service to this country. He does not have significant ties to China, he destroyed his Chinese passport and has only been to China once since he moved to the United States in the mid-aughts, Defendants like Lieutenant Tian are routinely released by this Court with no questions. This Court should do the same.

    3.    **Seriousness of the Offense**

The government argues that the seriousness of the offense supports detention because Lieutenant Tian "is charged with significant and serious crimes that impact the national security

of the United States. TIAN is a clearance holder with access to classified information,[7] much of which is retained in his mind, and cannot be adequately protected against." Motion, p. 6.

The government's posture about the seriousness of Lieutenant's Tina's alleged crimes at release is again, overstated. As indicated above, many of the documents and/or the information contained in them are public. Moreover, despite the government's assertion that Lieutenant Tian has demonstrated "his eagerness to part with sensitive information for money," the Indictment alleges he only received approximately $500 for military information. Hardly a grand conspiracy to get rich selling military "secrets" to America's enemies, as the government suggests.

Significantly, the government's allegations do not demonstrate that he knew the information would be sold to others, or that he himself had connections within the PRC to sell these documents. Instead, the chats outlined in the Indictment suggest Lieutenant Tian believed the information he allegedly provided his codefendant would be used by his codefendant for innocuous purposes like writing an article or an online class for former military or other military enthusiasts.

Moreover, the government has now searched Lieutenant Tian's home and has seized all his family's electronic devices. The government has had full access to any other materials he purportedly secreted away and it now maintains those. Thus, there can be no further risk he will reveal additional information, particularly given the strict electronic conditions proposed by pretrial services. The government's suggestion to this Court that Lieutenant Tian should continue to be detained pending trial because he might have some unidentified information in his mind

---

[7] There defense believes that there are serious questions about the scope of Lieutenant Tian's access to classified information and whether he was in fact permitted to have classified documents outside controlled spaces. Regardless, the government has the ability to and presumably has revoked his security clearance.

that the government cannot describe despite its 2-year investigation, is both Orwellian and inconsistent with the Bail Reform Act. It is also suspect given the government's overstatements about the nature of the information Lieutenant Tian is accused of "stealing."

## CONCLUSION

The Bail Reform Act requires Lieutenant Tian be released with conditions.

DATED: April 11, 2025.

                                              ANGELI & CALFO LLC

                                              *s/ Michelle Holman Kerin*
                                              Michelle Holman Kerin, OSB No. 965278
                                              michelle@angelicalfo.com
                                              121 SW Morrison Street, Suite 400
                                              Portland, OR 97204
                                              Telephone: (503) 954-2232
                                              Facsimile: (503) 227-0880

                                              *Attorney for Defendant*