WILLIAM M. NARUS, CAB #243633
Acting United States Attorney
District of Oregon
**GEOFFREY A. BARROW, D.C. #462662**
Geoffrey.Barrow@usdoj.gov
**KATHERINE A. RYKKEN, CAB #267196**
Katherine.Rykken@usdoj.gov
Assistant United States Attorneys
1000 SW Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:25-cr-00078-IM-1 |
| v. | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE PENDING TRIAL |
| **RUOYU DUAN, aka "Duan Xiao Yu," aka "D.X.Y.," aka "Lao Duan," aka "Little Fish"** | |
| **Defendant.** | |

### I.    INTRODUCTION

The government requests continued pretrial detention as to defendant RUOYU DUAN, aka "Duan Xiao Yu," aka "D.X.Y.," aka "Lao Duan," aka "Little Fish" (hereinafter "DUAN") as DUAN presents an ongoing danger to the community and a risk of flight. DUAN is charged with multiple offenses that pose a danger to the national security of the United States.  As alleged in detail in the Indictment, DUAN played a central role in this bribery scheme by recruiting co-defendant LI TIAN, JIAN ZHAO, and likely other active duty military personnel and security clearance holders to provide sensitive military equipment and information to individuals located in the People's Republic of China ("PRC").

For several years, DUAN collected sensitive information, recruited active-duty soldiers to provide sensitive information, brokered transactions with Chinese buyers, and facilitated the transfer of payments for sensitive military information.  He is the center of the conspiracy. He should remain detained as a danger to the community and a risk of flight.

## II.     PROCEDURAL BACKGROUND

On March 4, 2025, a federal grand jury in the District of Oregon returned a four-count indictment[1] charging Ruoyu DUAN and Li TIAN with Conspiracy in violation of 18 U.S.C. § 371, Bribery of a Public Official in violation of 18 U.S.C. § 201(b)(1)(C), and Receipt of Stolen Government Property in violation of 18 U.S.C. § 641.  The following day, a grand jury in the Western District of Washington returned a related indictment charging Jian ZHAO with similar charges as well as Conspiracy to Distribute National Defense Information in violation of 18 U.S.C. § 793(g).  DUAN, ZHAO, and TIAN have been in custody since they were arrested on March 6, 2025.  The government opposes DUAN's motion for pretrial release.

## III.    FACTUAL SUMMARY OF EVENTS RELATED TO DUAN

### A. Overview

DUAN was a former Army soldier, active from 2013 to 2017.  At the time of the indictment ZHAO and TIAN were active-duty U.S. Army soldiers, who both held SECRET security clearances, and were stationed at Joint Base Lewis-McChord (JBLM), in the Western District of Washington.  The investigation revealed the DUAN recruited active-duty military personnel, including TIAN and ZHAO, to provide sensitive military information to individuals located in the People's Republic of China (PRC).

---

[1] Three of the four counts are charged against DUAN.

**Government's Opposition to Defendant's Motion for Release**                                **Page 2**

At DUAN's request, TIAN transferred sensitive military information related to the United States Army's operational security, including intelligence reports, training materials and technical manuals to DUAN. TIAN entered restricted military installations and took photographs and documents belonging to the United States Army. In return, TIAN received at least $500 from DUAN (who was receiving payments from accounts based in the PRC, for the passage of sensitive documents.[2]

Consistent with his role as a PRC recruiter, DUAN introduced Jian ZHAO to two individuals in China who were interested in buying military equipment and sensitive information. From July to December 2024, ZHAO sold military equipment and information to multiple buyers in the PRC. ZHAO sold one buyer an encryption capable military computer, approximately twenty hard drives, some marked as classified, and multiple sensitive military documents.

### B. DUAN Solicited Sensitive Military Information from TIAN

Sometime in 2021, DUAN introduced TIAN to Conspirator 2 who was based in Hong Kong. On November 28, 2021, TIAN emailed Conspirator 2, introducing himself as a friend DUAN's who had mentioned a job offer that TIAN believed he would be a "good fit" for. TIAN explained that his work experience and education would meet the requirements of the "job opportunity." TIAN provided his resume and touted his experience managing property and assets for the U.S. government.

---

[2] It total, from December 31, 2021, to July 31, 2024, DUAN paid TIAN approximately $4,175. DUAN frequently paid TIAN and other security clearance holders shortly after DUAN received payments from China based accounts. While the defense argues that DUAN receives support from his parents, based on the names on the transactions, these funds do not appear to originate from them.

**Government's Opposition to Defendant's Motion for Release**                                                      **Page 3**

On December 26, 2021, TIAN emailed Conspirator 2 a white paper with recommendations related to commercial real estate investments on the East Coast of the United States. On or about December 30, 2021, DUAN received approximately $2,000 from a PayPal account based in China. The following day, Conspirator 2 thanked TIAN for the white paper and said that "Mr. Duan" had been paid $1,000, which DUAN would then pay to TIAN for his work. In the same email, Conspirator 2 asked for "less open source" material and requested additional information from TIAN. That same day, DUAN paid TIAN $1,500 via PayPal.

DUAN's introduction of TIAN to Conspirator 2, Conspirator 2's solicitation of the white paper and DUAN's payment to TIAN for the information are consistent with known PRC intelligence service tradecraft, whereby individuals with access to sensitive information are recruited through solicitations to write white papers on matters which the targets of the recruitment have some background. The recruitment cycle typically begins with the passage of unclassified material, but gradually increases to more sensitive information.

On or about October 18, October 25, and November 3, 2022, TIAN sent DUAN military information via e-mail. Specifically, in multiple e-mails, TIAN sent DUAN links to a Google Drive containing OSINT reports.[3] On or about October 13, 2023, TIAN sent an unencrypted e-mail from his U.S. Army email account to his personal email transmitting a military reference document for planning, training, and operations for the Stryker[4] Brigade Combat Team (SBCT).

---

[3] OSINT is an acronym for Open Source Intelligence and refers to information that is not classified.

[4] The Stryker is a family of eight-wheeled armored fighting vehicles that serve as the backbone of the Army's Stryker Brigade Combat Teams. The SBCT's are designed to be rapidly deployed into combat zones around the world.

This document contained markings indicating the document could only be disseminated to federal employees and government contractors.

On February 20, 2023, TIAN sent DUAN sensitive military information via email, specifically, links to Google Drives containing reports related to the Stryker combat vehicle. These materials were marked with warnings about proper dissemination of the documents and that distribution was limited to DOD personnel or their contractors only. TIAN and DUAN also communicated via different messaging apps including Facebook and WeChat, which is an encrypted instant messaging application based out of the PRC.

On or about May 3, 2024, video footage from TIAN's unclassified office at Joint Base Lewis-McChord ("JBLM") showed that TIAN held his phone up to his computer screen and took screenshots of his computer screen. On or about May 5, 2024, video footage from TIAN's unclassified workspace at JBLM showed that TIAN entered his workspace at approximately 10:45 p.m. TIAN removed a document marked SECRET from his desk and walked away with it at approximately 10:50 p.m. Based on the video, TIAN did not re-enter his unclassified workspace and did not return the SECRET document that day.

On or about May 6, 2024, video footage from TIAN's classified workspace at JBLM showed that TIAN brought his personal cell phone inside, printed a classified document, and left with the classified document. TIAN returned with the same classified document approximately three-and-half hours later. On or about May 8, 2024, video footage from TIAN's classified workspace at JBLM showed that TIAN brought his personal cell phone inside the classified workspace during a SECRET-level briefing.

### C. DUAN Introduced ZHAO to PRC Buyers of Military Equipment and Information

Sometime in 2023, DUAN introduced ZHAO to two individuals based in China, Conspirator 3 and "S.K.K." On October 16, 2023, Conspirator 3 wrote ZHAO, "Boss Duan says you have things to sell. Mind telling what you have." From July to December 2024, ZHAO sold Conspirator 3 an encryption capable military computer, approximately twenty hard drives, some marked as classified, and multiple sensitive military documents. In exchange, he received more than $15,000

In November of 2023, "S.K.K." introduced himself to ZHAO as a friend of DUAN's. "S.K.K." told ZHAO that he had previously purchased equipment from ZHAO through DUAN. In negotiating the sale of military equipment, "S.K.K." frequently directed ZHAO to transfer money though DUAN and to negotiate with DUAN.

In October 2024, ZHAO sold sensitive military documents to individuals in the PRC. Like TIAN, he came onto the JBLM property on a weekend to photograph and send the documents. ZHAO told Conspirator 3 that he had "good stuff" and asked Conspirator 3 to get a quote from any buyer. ZHAO asked Conspirator to "spread the news. It's Brigade Level." Conspirator 3 responded, "Ok. Done. Recall. this needs some time. This is way top [we] must be very very careful." ZHAO replied "Very sensitive document. Super difficult to get" and also that "If you want this I'll take whatever you feel like … but in these couple of years, anything that touches himars, 3-4000 is the starting price. For you, 3000."[5] Over the course of several days, ZHAO and Conspirator 3 haggled over the price of the document, whether one or two

---

[5] HIMARS is a reference to the High Mobility Rocket System, a long-range artillery system that the U.S.
Army uses to simultaneously launch multiple, precisions-guided rockets.

**Government's Opposition to Defendant's Motion for Release**                                    **Page 6**

documents would be sent, how to send the documents, and agreed to a sale price of $6,500 for two documents. Conspirator 3 told ZHAO that he couldn't afford to make the buyer angry. Messages between ZHAO and Conspirator 3 and surveillance video of ZHAO on October 27, 2024, show ZHAO photographing power point presentations from his desk at JBLM and communicating with Conspirator 3 at the same time.

### D. ZHAO Transfers HIMARS material to DUAN

In late April 2023, ZHAO sent DUAN a technical manual for the operation of the HIMARS platform. The document contained markings, indicating that distribution was limited to DoD personnel, and that it was export restricted.

### E. Search Warrants Recover Additional Evidence

On March 6, 2025, the FBI executed search warrants at DUAN's residence in Oregon. While review of the electronic evidence is ongoing, DUAN's computer had a folder labeled "Downloads" (based on machine translation). In that folder, investigators found 27 OSINT zip files that mirrored the names of the 27 zip files TIAN sent as Google Drive links to DUAN. Some of the OSINT zip files were placed in a folder on DUAN's computer labeled, "The Treasure Trove of Knowledge" (again based on machine translation). In total, investigators recovered approximately 395 OSINT files from DUAN's computer. Of the 395 OSINT files, 153 are labeled CUI, or CUI//REL TO USA, FVEY, indicating that dissemination is limited to the Five Eyes (Australia, Canada, New Zealand, the U.K. and the U.S). In addition, 83 of the 153 files contained a distribution statement or a warning statement along the lines of "not approved for public release" or "authorized to US government agencies and their contractors" or "limited to military, intelligence, law enforcement, or security duties, not releasable in whole or

in part to the public." Investigators also found the HIMARS technical manual ZHAO sent DUAN.

Investigators found additional evidence at TIAN and ZHAO's residences in Washington. TIAN gave a post-arrest interview with the FBI where he made a number of statements. During the interview, TIAN minimized his conduct, and initially lied to investigators when he said that he never provided his co-conspirator DUAN with information, indicated that DUAN never asked for anything from TIAN, and that DUAN never paid TIAN for information. TIAN later backtracked on these statements when he was confronted with his own communications with DUAN about the passage of military documents. TIAN eventually stated "I definitely made a wrong choice. Yes. Sending them," and acknowledged that the payments he received were for documents he passed like the CUI and restricted documents presented to TIAN by interviewing agents. TIAN claimed to have not remembered his conduct when confronted by investigators about his previous dishonest statements about not providing anything to DUAN. TIAN also stated, "I think if you guys are doing, connecting the dots, I am guilty. Um. I am guilty for, um, taking these documents and sending emails, um, which is match the stolen of government property." TIAN later admitted, "I am 100% guilty."

Additionally, TIAN admitted to investigators that at DUAN's request, TIAN participated in a podcast, which was to be broadcast in China, where he discussed a "Chinese missile project." During the podcast, TIAN used a disguise, blurred his background, "toned" his voice, and wore a mask and sunglasses. During the podcast, TIAN was identified only as a "U.S. soldier" and discussed life as a U.S. Army soldier in Japan. TIAN stated that he disguised himself to prevent "something like this," which was a reference to his interview with FBI agents.

**Government's Opposition to Defendant's Motion for Release**          **Page 8**

## IV. LEGAL STANDARDS

### A. The Government Qualifies for a Detention Hearing Under the Bail Reform Act

The Bail Reform Act authorizes a detention hearing under 18 U.S.C. §§ 3142(f)(1) or (f)(2). A detention hearing is appropriate if a defendant is accused of one of the crimes listed in section 3142(f)(1), which is not the case here, or if the government shows by a preponderance of the evidence that defendant is a flight risk, will obstruct justice, or will tamper with witnesses, as required under section 3142(f)(2).

For the reasons set for below, DUAN is a flight risk under section 3142(f)(2), in part because of the nature of the offense charged and the severity of the potential sentence facing DUAN, but also because he conspired with those the defense describes as "sophisticated Chinese intelligence agents" who have the resources and incentive to help him flee to China and evade prosecution. In addition, DUAN has frequently traveled to China and, prior to indictment, told U.S. Customs that planned to leave the United States to establish a business and reside in Japan.

### B. Duan's Pretrial Detention Should Continue

Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Section 3141 *et seq.*, federal courts are required to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. *See* 18 U.S.C. § 3142(e) (a judicial officer "shall" order detention if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of dangerousness must be supported by clear and convincing evidence. *See United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990). A finding of risk of nonappearance must be supported by a preponderance of the evidence, *United States v. Winsor*,

**Government's Opposition to Defendant's Motion for Release**                                                      **Page 9**

785 F.2d 755, 757 (9th Cir. 1986), meaning the Government "must demonstrate that it is more likely than not that there is a serious *risk* that the defendant will flee, not that it is more likely than not that the defendant *will* flee." *United States v. Figueroa-Alvarez*, 681 F. Supp. 3d 1131, 1138-39 (D. Idaho 2023) (emphasis in original.)

The Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g). As discussed below, these factors weigh heavily against pretrial release.

Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. *See* 18 U.S.C. § 3142(f)(2); *Reem v. Hennessy*, 2018 WL 1258137, at *2 (N.D. Cal. Mar. 12, 2018); *see also United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000) (holding that the government is entitled to proceed by proffer in detention hearings). In the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffer. *Id*. at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." *Id*. (internal quotation marks omitted).

Each of the relevant statutory factors in the detention analysis underscore that the Defendant presents both an ongoing danger to the community and a serious risk of flight if released on bond.

The Nature and Circumstances of the Offenses Charged

The first factor—the nature and circumstances of the offense charged—contemplates consideration of not only the specific acts and charges alleged in the indictment, but also the potential penalty that may be imposed if the person is convicted. *See, e.g.*, *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008); *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (noting defendants faced respectively penalties of 35 and 70 years if convicted).

Here, the nature and circumstances of the offenses are undeniably serious, and the penalties are appropriately severe. This is an ongoing investigation, and the government anticipates bringing a superseding indictment with additional charges. Under the existing indictment, DUAN faces a significant sentence in this case. With respect to the severity of the sentence DUAN faces, a preliminary calculation of the applicable guidelines results in a total offense level of at least 24, prior to any departures upward or downward, resulting in potential prison sentence of 51 to 63 months. *See Townsend*, 897 F.2d at 995; *see also United States v. Cisneros*, 328 F.3d 610, 618 (10th Cir. 2003) (holding defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond). This fact, combined with the fact that Defendant was actively engaged in buying sensitive military documents heightens the risk of flight, and most importantly, puts our community, specifically our national community, and the national security of the United States in danger. DUAN was a former Army soldier, trained in how to safeguard military information, including the kind of information he received from TIAN and ZHAO. DUAN understood he was not entitled to receive sensitive military information, but he nevertheless made payments to obtain that information. DUAN facilitated the introductions of individuals in China to his friends and associates in the U.S. Army, which led to the passage of sensitive information, including in

**Government's Opposition to Defendant's Motion for Release**                                                **Page 11**

ZHAO's case, hard drives marked "SECRET' and "TOP SECRET."  Executive Order 13526 defines "TOP SECRET" as information whose unauthorized disclosure could be reasonably expected to cause *exceptionally grave damage* to national security.  Executive Order 13526 also defines "SECRET" as information whose unauthorized disclosure could be reasonably expected to cause *serious damage to national security*.  Undeniably, this conducted has already placed our national security at risk and weighs heavily in favor of detention.

<u>The Weight of the Evidence</u>

The second factor is the weight of the evidence.  Although section 3142(g)(2) specifically enumerates weight of the evidence as a consideration in determining release, the Ninth Circuit has held that it is to be afforded less weight than the other statutory factors.  *See Townsend*, 897 F.2d at 994; *Winsor*, 785 F.2d at 757.  The weight of the evidence is, however, an important and relevant consideration in the Court's evaluation of whether a defendant "will fail to appear or will pose a danger to any person or to the community.  *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985).

Here, the weight of the evidence against the Defendant is strong.  In fact, DUAN admits in his memorandum for release that he was targeted by Chinese intelligence agents but insists he was a "hapless victim."  (Dkt. 34 at 6-11.)  But each offense with which DUAN is charged is well-documented, from the purchase of sensitive military information through messages among DUAN and his co-conspirators, to financial transactions that show DUAN receiving money from the PRC before sending payments on to his co-conspirators.

DUAN now appears to claim that the information he passed "appear[s] available on the internet" through a simple Google search. (*Id.* at 9-10).  While this may ultimately be an issue decided at trial, Army personnel have examined the information that DUAN has proffered and

reached a different conclusion. While OSINT reports compile publicly available information, the reports themselves are not publicly available. This is reflected in the OSINT reports DUAN solicited from TIAN and kept in his "Treasure Trove of Knowledge." Moreover, information marked "CUI" or "controlled unclassified information," as many of these OSINT reports were, is a distinct category of information that, while not classified, is subject to safeguarding procedures and dissemination controls, pursuant to Executive Order 13556. A significant number of documents that DUAN received were also marked with distribution restrictions, which clearly indicated the documents were limited to DOD personnel and their contractors only. These are restrictions that DUAN, as a former service member, well understood. While outdated manuals with similar titles may appear on websites, Army personnel have not located the materials DUAN solicited on unsecured platforms. This should come as no surprise. If DUAN could find the materials with "a simple Google search," he would not have to rely on his active-duty co-conspirators for the materials or pay them for the information. Moreover, as a former Army soldier, DUAN understood that he was not entitled to receive the information he paid for. DUAN's activity is consistent with PRC intelligence service tradecraft. He asked for less sensitive information to get his targets comfortable with providing information and then pressed for more sensitive information.

     Finally, DUAN's claim that he was duped by Chinese intelligence is inconsistent with the evidence in this case. The investigation has not uncovered evidence that DUAN provided information to the PRC when he was on active duty. That suggests that when DUAN was approached by the Chinese, his value was not the information that he had, but the information he could acquire through his relationships with active-duty military members and security clearance holders. DUAN was no dupe; he was an active recruiter. He knew what the Chinese wanted,

**Government's Opposition to Defendant's Motion for Release**                                      **Page 13**

and he knew who could provide that information. Consistent with his role as a recruiter, he made introductions, pushed for more information, brokered transactions and funneled payments.

Where, as here, the evidence of Defendant's guilt is strong, it provides "a considerable incentive to flee." *United States v. Millan*, 4 F.3d 1038, 1046 (2d Cir. 1993); *see also Motamedi*, 767 F.2d at 1408 (9th Cir. 1985); *United States v. Palmer-Contreras*, 835 F.2d 15, 18 (1st Cir. 1987) (where "the evidence against defendants is strong, the incentive for relocation is increased").

### The Defendants' History and Characteristics

Consideration of the history and characteristics of the person under section 3142(g)(3) includes the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state, or local law. *See* § 3142(g)(3)(A) and (B).

Critically, Defendant has ties to the PRC, including frequent travel to the PRC, financial ties, and both of his parents, who currently reside there. The investigation to date shows that DUAN is not employed but instead receives disability. DUAN had booked travel to the PRC, leaving on March 17, 2025, with a return date of April 3, 2025. In addition, when interviewed by Customs and Border Patrol last fall, DUAN said he planned to move to Japan with his co-conspirator, ZHAO. E-mails obtained pursuant to a search warrant show that DUAN has acted on that desire, including by talking with a real estate company about renting a house in Japan and researching how to obtain a Visa for Japan. Finally, as the defense suggests, DUAN has contacts

with "sophisticated Chinese intelligence agents," who have the resources and incentive to provide DUAN with the ability to leave the country undetected. Each of these facts creates a significant risk of Defendant's non-appearance.

On March 6, 2025, the FBI executed a search warrant at DUAN's residence in Hillsboro, Oregon. Based on investigators' knowledge of DUAN's possession of firearms and the nature of the case, SWAT was used to make entry. They employed standard law enforcement techniques to protect the officers and the neighborhood. In the residence, they found that DUAN, his wife and his five-year old child were living in squalor. Agents found urine and feces on the floor along with nineteen unsecured firearms and ammunition. An unsecured, loaded firearm was found on the floor of a bedroom. As a result, the FBI contacted the Oregon Department of Heath and Human Services. They responded to the scene and took custody of the child. A subsequent search uncovered evidence that DUAN had abused his wife and minor child and that his wife intended to leave him. The FBI alerted DHS and the Hillsboro Police Department of the evidence of domestic violence.

While the current status of the domestic violence investigation is unknown, there is ample reason to question DUAN's character, his family tiesand his desire to remain in the United States. There is also additional concern that release would pose a danger to DUAN's wife and child.

<u>Nature and Seriousness of the Danger to the Community</u>

In evaluating the nature and seriousness of the danger a defendant poses to the community, the Court may consider, *inter alia*, the defendant's criminal history; whether the crimes charged required intelligence, planning, capital, facility in deception, international

communications, or international motives; and whether the charged crimes carry severe penalties.[6] *See Townsend*, 897 F.2d at 996.

Here, DUAN is charged with significant and serious crimes that impact the national security of the United States. DUAN has had access to large quantities of sensitive information over the course of several years, much of which is retained in his mind, and cannot be adequately protected against. The communication of the sensitive information in this case occurred using everyday methods–computers and social media apps. TIAN and DUAN communicated via several messaging aps including Facebook and WeChat, which is an encrypted instant messaging application based out of the PRC. Allowing DUAN easy access to either of these, as he would invariably have if released, presents an ongoing danger to the community. DUAN's ability to access information that he may have secreted away electronically or otherwise, undermines any sense of safety the community may have if DUAN was released. Moreover, over the course of the conspiracy, DUAN has maintained contact with several other known security clearance holders in addition to the individuals mentioned in the charged case. DUAN has paid other known security clearance holders shortly after receiving payments from third-party accounts. The Government continues to investigate the nature of these payments, but DUAN has already indicated a willingness to bribe security clearance holders and servicemembers for military information. If DUAN were to be released, he would be free to communicate with others who have access to sensitive information. This presents a serious threat to the community that cannot be adequately contained if he were to be released. Other than detention, containing the

---

[6] Other factors listed in *Townsend*, such as the defendant's prior performance on court-imposed supervision; whether the defendant illegally possessed firearms or large quantities of prohibited drugs; and, whether the defendant was on probation, parole, supervised release, or subject to conditions of pretrial release, are inapplicable here. 897 F.2d at 996.

**Government's Opposition to Defendant's Motion for Release**                                **Page 16**

information in DUAN's mind and his access to any additional information he may maintain through his additional contacts, or information that he may have hidden is impossible, especially when DUAN has already shown his eagerness to buy sensitive information for money. Simply put, DUAN presents a significant danger to the community, in addition to presenting a serious risk of flight.

## V.   REQUEST FOR STAY OF RELEASE

If the Court finds that release is appropriate, the government requests that the Court stay the release order so that the government can appeal that decision to the district judge. *See* Fed. R. Crim. Proc. 47 (which governs criminal motion practice generally). Here, a stay would be needed to enable this district judge to meaningfully review the any release order before it took effect. Without a stay, DUAN would be released following his initial appearance. This Court has inherent power to control its docket "in a manner which will promote economy of time and effort for itself, counsel, and for litigants." *CMAX, Inc. v. Hall,* 300 F.2d 265, 268 (9th Cir. 1962). Entry of a stay is one of those inherent powers. *Id.*

## VI.   CONCLUSION

Defendant presents a danger to the community and a serious risk of flight that no set of release conditions can mitigate. For these reasons, the Government respectfully submits that the Court should enter a permanent order of detention pending trial for each defendant.

Dated: April 18, 2025                              Respectfully submitted,

                                                                    WILLIAM M. NARUS
                                                                    Acting United States Attorney

                                                                    */s/ Geoffrey A. Barrow*
                                                                    GEOFFREY BARROW, D.C. #462662
                                                                    KATHERINE A. RYKKEN, CAB #267196
                                                                    Assistant United States Attorneys